EXHIBIT 1

TO

VERIFIED COMPLAINT *IN REM*

DECLARATION OF PATRICK J. FEGAN

# DECLARATION OF PATRICK J. FEGAN
# IN SUPPORT OF COMPLAINT

I, Patrick J. Fegan, provide the following information under the penalty of perjury, as provided by 28 U.S.C. § 1746, and declare that the following is true and correct to the best of my knowledge, information and belief.

**A.     Declarant's Background**

1.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") assigned to Nashville, Tennessee.  I have been a Task Force Officer since April, 2023 and am assigned to the Louisville Field Division, Nashville District Office, Task Force Group 2.  I have received training from local, state, and federal instructors in many areas including; narcotic investigations, narcotic identification, informant management, undercover operations, money laundering, Title III intercepts, and narcotic forfeitures and seizures. The federal crimes I am assigned to investigate include but are not limited to violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. §§ 1956 & 1957.

**B.     Items Sought for Forfeiture**

2.      Pursuant to 21 U.S.C. § 881(a)(6), the United States seeks the forfeiture of $28,000 United States currency ("Defendant Property") seized at Nashville International Airport on May 25, 2023.

**C.     Basis of Information**

3.      The information in this Declaration was obtained through my personal observations, training and experience, information gathered during interviews of and conversations with civilians and other law enforcement officers, and written reports and investigations conducted by other law enforcement officers. I have not included every item of information known to me concerning the Defendant Property and the facts surrounding this

2

Declaration, but only those relevant to a determination that the Defendant Property is subject to forfeiture.

**D.      Background Facts**

4.      On May 25, 2023, agents with the DEA Nashville Task Force Group 2 received information from a confidential source in reference to Delandro Lewis, a/k/a Delandzro Markquize Lewis ("Lewis"), who was traveling from Nashville International Airport ("BNA") to Los Angeles California ("LAX"). Based upon my training and experience Los Angeles is a known source city for narcotics distribution.

5.      Records indicated that on May 25, 2023, at 11:25 a.m. (CST), Lewis booked his flight to depart BNA that same day at 8:10 p.m. (CST), via Southwest Airlines. Lewis booked a return flight from LAX back to BNA for May 27, 2023. Based upon my training and experience, drug traffickers and their money mules will often book last minute travel to make it more difficult for law enforcement to predict their movement.

6.      A criminal history check obtained through the National Crime Information Center, revealed Lewis has an extensive criminal history that includes multiple counts of possession of a controlled substances for resale, felony manufacturing of a schedule VII substance, possession of methamphetamines, multiple sales of methamphetamines, felony sales of hydromorphone, felony tampering with evidence, possession of a counterfeit controlled substance, unlawful possession of a weapon, multiple felony and misdemeanor evading arrests, multiple resisting arrests, and a felony probation violation.

7.      Records showed that Lewis checked one bag at BNA with Southwest Airlines.

### Interaction with Lewis on May 25, 2023

8. At approximately 7:20 p.m., Metro Nashville Airport Authority ("MNAA") Sergeant Brad Kessler ("Sgt. Kessler") located Lewis' checked bag. Sgt. Kessler placed Lewis' checked luggage in an array of other checked luggage and introduced narcotics trained K-9, "Havoc." Havoc showed a positive alert for the odor of narcotics emanating from the Lewis' bag. Sgt. Kessler then retrieved Lewis' bag and brought it to departure gate D4, where Lewis' plane was departing.

9. At approximately 7:45 p.m., Sgt. Kessler and I met Lewis at gate D4. After we identified ourselves, we explained that a K-9 alerted to his checked luggage. I asked Lewis if there were any narcotics or weapons in his checked luggage. Lewis stated there were not. I asked Lewis for consent to search his checked luggage. Lewis became belligerent and stated he did not want anyone searching the bag.

10. Sgt. Kessler asked Lewis for his driver license, which he provided. Lewis stated he was going to contact his attorney; however, Lewis began a telephone video conference with an individual he referred to as "Momma".

11. Sgt. Kessler and I explained to Lewis that due to a trained narcotics dog alert, the luggage was going to be temporarily placed in evidence while a warrant was obtained. We then asked Lewis if he would like to speak more about the checked luggage. Lewis declined and became increasingly belligerent.

12. Sgt. Kessler then requested contact information from Lewis. Lewis provided cell phone information for one of his two phones. When Lewis was asked for an alternate number, Lewis stated that we [TFO Fegan and Sgt. Kessler] did not need that information. Based upon my training and experience, the use of multiple cell phones indicates drug trafficking activity in that

4

drug traffickers and their associates will often have one phone for personal use and one for illegal activities. This allows them to destroy or discard potentially damaging evidence without having to destroy personal items like pictures, social media, or texts that do not involve illegal activities.

13. Lewis confirmed that the information on his driver license was correct and confirmed that he did not wish to be present during the application of a State of Tennessee search warrant. The interview ended.

### *Search Warrant Granted and Discovery of Defendant Property*

14. On May 26, 2023, at approximately 3:38 a.m., a Judicial Magistrate for the General Sessions Court of Davidson County Tennessee issued a search warrant for Lewis' checked bag.

15. Upon execution of the warrant, investigators discovered a large quantity of United States currency ("U.S. currency") was concealed throughout multiple pairs of pants. The bag contained four pairs of new pants, four new shirts, multiple pairs of new underwear, and a new swimsuit.

16. Based on my training and experience, I believe the clothing items were in the bag as a cover or concealment designed to hide the U.S. currency. Often drug traffickers and their money mules purchase new clothing to use as a prop to give the appearance of normal travel and new clothing is less likely to carry scent of narcotics. Further, Lewis' trip was to last approximately 30 hours, and it appeared that the amount of clothing was inconsistent with such a short trip.

17. In addition to the large quantity of U.S. currency, two tablets of suspected MDMA were discovered, hidden underneath a makeshift compartment within the shoes that were in the Lewis' checked luggage.

*Interview with Lewis on May 26, 2023*

18.  Later that morning, at approximately 5:00 a.m., Sgt. Kessler contacted Lewis to arrange an interview, and Lewis agreed to speak later that day. At approximately 11:30 a.m., Lewis met with me and Sgt. Kessler. We reiterated that this interview was consensual and that he was free to leave at any time.

19.  Sgt. Kessler showed Lewis the U.S. currency, as well as the suspected MDMA tablets. Sgt. Kessler asked why Lewis was carrying such a large amount of U.S. currency to Los Angeles. Lewis provided the following information:

   a. Lewis was a recording artist under the name "Dro Deuce;"

   b. Lewis was going to pay another recording artist approximately $30,000 for a "feature;"

   c. Lewis did not state who the artist was or the particular studio;

   d. Lewis planned to stay with women he would meet while in Los Angeles;

   e. Lewis frequently travels to Los Angeles with large sums of U.S. currency because he does not know how much he is going to spend;

   f. Lewis had not filed tax returns in recent years; and

   g. Lewis owned a business called "Da Bad Guy Entertainment."

20.  To back up his story, Lewis produced the following documents:

   a. an unsigned, typed document that stated the recording rates that Lewis charges individuals; and

   b. an old checking account statement for his company, showing a balance of $45.88.

21.  Based upon my review of the documents, they did not support Lewis' story. The recording rates document had no indication of any particular payment to be made in Los Angeles

during the dates of his trip. The checking account document was not close in time to his trip and did not have a balance sufficient to explain the large amount of cash in the luggage.

22. I asked Lewis if he had any contractual documents with the artist he was paying to be featured. Lewis stated he did not.

23. Sgt. Kessler asked Lewis if he could provide any communications, such as text messages or emails, to confirm the business transaction involving the U.S. Currency. Lewis stated he did not have any such communications.

24. Sgt. Kessler asked for consent to review Lewis' phones for any messages that could act as proof of Lewis' business arrangement. Lewis declined and stated that he did not have relevant information on his phones.

### *Subsequent Investigation*

25. Upon transferring the U.S. currency to Loomis for an official count, it was further determined to be $28,000 U.S. currency, which is identified herein as the Defendant Property.

26. Da Bad Guy Entertainment, Inc., has been inactive since August 11, 2021. Records obtained from the Tennessee Secretary of State's office could not connect Lewis to that entity or show his role in it.

27. Lewis is known to be connected to drug trafficking and the movement of drug-related money. For instance, on May 7, 2020, law enforcement seized a large amount of cash from Lewis as part of an intercept of drug-related funds being delivered by Lewis in connection to a known drug trafficking organization. These funds were forfeited to the United States in the matter styled *United States of America v. $155,900.00 United States Currency*, 3:20-cv-00879 (M.D. Tenn. October 13, 2020).

**E.  Conclusion**

28. Based on the foregoing, my experience and training, and this investigation as a whole, I believe the facts support a reasonable belief that the Defendant Property was furnished or intended to be furnished in exchange for a controlled substance or proceeds traceable to such an exchange, or monies used or intended to be used to facilitate a violation of 21 U.S.C. § 801 *et seq.*, including 21 U.S.C. § 841 (illegal drug trafficking) and 21 U.S.C. § 846 (attempted drug trafficking).

29. The Defendant Property is, therefore, forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

I declare under the penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

 

Task Force Officer, Patrick J. Fegan
Drug Enforcement Administration